1
2
3
4
5
6
7
8              IN THE UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10    DARRION TROY GAINS,

11              Petitioner,              No. CIV S-03-0059 LKK EFB P

12        vs.

13    SCOTT KERNAN, Warden,

14              Respondent.              <u>FINDINGS AND RECOMMENDATIONS</u>

15    _____/

16        Petitioner is a state prisoner proceeding *in propria persona* with an application for a writ

17    of habeas corpus pursuant to 28 U.S.C. § 2254.  He challenges a 1998 judgment of conviction

18    entered against him in Sacramento County Superior Court on charges of first degree murder,

19    committed while one or more of the principals was armed with a firearm; attempted murder

20    committed with deliberation and premeditation, and while one or more of the principals was

21    armed with a firearm; conspiracy to commit assault with a firearm; being armed in the course of

22    the conspiracy; and first degree burglary while one or more of the principals was armed with a

23    firearm.  He seeks relief on the grounds that: (1) juror misconduct violated his right to a fair trial;

24    (2) the trial court's exclusion of evidence of third party culpability violated his right to due

25    process; and (3) jury instruction error violated his right to due process.  Upon careful

26    consideration of the record and the applicable law, the undersigned recommends that petitioner's

1

application for habeas corpus relief be denied.

## I.   Factual Background[1]

### A.  Prosecution's Case

The victims and the defendants had known each other for years. Defendant Cook, his brother Brian, and Brian's girlfriend, Kami Jonutz, shared an apartment in Sacramento.  During that same time, Jimmy Fonseca, the murder victim, Carl Kato, the surviving victim, and Sara Beasley also shared an apartment in Sacramento.

In the first half of October, Kato, Fonseca, and one of Fonseca's friends went with Lozo to a Raley's grocery store where they saw defendants Cook and Gains.  An altercation occurred and Fonseca struck Cook in the head a number of times with a gun, knocking him to the ground.  Later that day, Kato had a telephone conversation with Cook, who was angry and ended the call by hanging up on Kato.

A day or so later, while defendants Cook, Lozo, and Gains were in Brian Cook's apartment, and while in the presence of defendants Lozo and Gains, defendant Cook told Jonutz he had been pistol-whipped by Kato.  Defendant Cook also told Jonutz some money had been stolen from Lozo.  Defendants all appeared to be angry. The group talked about the incident for almost an hour, and all three defendants made comments indicating they were going to take revenge on Kato.

On Monday, October 16th, Cook and Lozo met with Jose Gomez and told him about an occasion in which Kato and someone else took money from them.  Cook and Lozo seemed angry and upset. Cook told Gomez they were looking for a gun so Gomez took them to see a friend of his who sold them a .38 caliber revolver for "a couple hundred dollars."  The gun was in a black fabric case.

Gomez drove the group back downtown and the defendants and Gomez went to the Burger King where they met Gains and his girlfriend, Tomesia Hale.  The group decided to take Hale home. In route, Cook told Hale that Kato had hit him in the head with a gun.  He laughed along with the other men and said, "[t]hat's okay,

I'm coming back."  Along the way, Cook told Gains " . . . I got the mask" and told Hale he and Gomez had purchased a gun earlier.

---

[1]  In its unpublished memorandum and opinion affirming petitioner's judgment of conviction on appeal, the California Court of Appeal for the Third Appellate District provided the following factual summary.  *See* Nov. 20, 2004 Amended Answer, Ex. C (hereinafter Opinion), at 3-11.  Other portions of this opinion were published in *People v. Cook*, 91 Cal.App.4th 910 (2001).

Later, defendants went to a small store where they purchased some knit caps to use when they went to Kato's apartment.  After purchasing the caps, Gomez and Cook bought two additional ski masks, with eye holes already in them, at another nearby store. The group returned to Gomez's car, where defendants retrieved the gun they had purchased and agreed to meet Gomez later.

Meanwhile, around 5 p.m. that same day, Kami Jonutz returned home from work and found defendants Gains, Lozo, and Cook, and Brian Cook in her living room.  Defendant Cook showed her a handgun which he removed from a leather zippered pouch.  He described it as a .38 Special revolver and told her he had purchased it earlier that day.  Defendants were talking about using the gun that night to get revenge on Kato, and spoke about it for almost an hour.  Meanwhile, Brian brought three black knit caps into Jonutz's bedroom where he cut eye holes in them and then gave them to defendants.  The three defendants left the apartment around 7 p.m.

Around 8 p.m., defendants and co-defendant Bolds met with Gomez and agreed to go to Kato's house that night.  Around 9:45 p.m., the group drove to an area near Kato's apartment, and parked a short distance away.  Around 9:45 p.m., the five men got out of Matt Cook's car, walked down an alley, and stood there for a while until Karen Gonzales spoke to Gomez.  Karen and her partner lived in the apartment complex across the alleyway from the victims' apartment, and had seen the men standing in the alley near a dumpster.  Karen thought something was suspicious because some of these men appeared to be hiding, so she approached the man near the dumpster, inquired what he was doing, and asked him to leave.  Gomez, who was smoking, replied they were smoking a "joint" and told her they would be gone in a few minutes.

Gomez was armed with a small .380 automatic Glock which he had in his pocket and loaded while they were in the alley.  Lozo had the .38 caliber revolver he had purchased from Garcia earlier that day.  Before approaching Kato's apartment, Cook, Lozo, Gains, and Gomez pulled the ski caps down over their faces.

When Lozo and Gains approached Kato's apartment, Gomez saw someone inside pull back the curtain and look outside.  The person appeared to panic and make a quick movement.  Gomez thought he saw that person with a gun, whereupon he and Bolds fled toward the alleyway, running in different directions.  As Gomez and Bolds left, Lozo forced the apartment door open.

Meanwhile, Kato had gone to bed and had locked his bedroom door.  Beasley was in bed asleep while Fonseca sat in a chair in her bedroom listening to music and reading the newspaper near the window.  Shortly before 10 p.m., Beasley was awakened by the

3

sound of a gunshot and the sound of her bedroom door being
kicked open.  She saw a masked man standing in the doorway,
holding a gun.  The intruder was wearing dark, baggy clothing and
a black ski mask with holes cut in it for his eyes and mouth.  From
a distance of only a few feet away, the intruder leaned over
Fonseca and fired a second shot at him, stating in a deep voice,
"[d]ie mother fucka, die."  His voice sounded vengeful, angry and
hateful.  Fonseca fell to the floor and the gunman shot him again.

At the same time, Kato was awakened by loud noise and the sound
of gunshots.  His bedroom door was kicked opened [sic] and three
men wearing dark clothing and ski masks entered.  The largest of
the three men was pointing a gun at him.  All three of the men
were about six feet tall.[2]  Thinking it was a joke, Kato said, "[s]top
playing."  Seconds later, he saw two flashes and heard two
gunshots.  He jumped out of bed after the first shot and was hit by
the second shot as he rolled off the bed.  He ran into the other
bedroom where he saw Fonseca lying on the floor, bleeding.

Beasley ran outside for help.  Fonseca asked a neighbor who was
attempting to assist him, to pick up a gun that was lying a few
inches from his right hand and give the weapon to Beasley.  The
neighbor refused, but Beasley picked up the gun and put it beneath
her bed.

About 11:30 p.m., defendants Cook and Gains returned to the
apartment where they told Brian they had gone to Kato's house,
kicked down the door and started shooting.  Forty-five minutes
later, Lozo arrived and said he had kicked in the door and was
shooting.

Around 11 p.m., that same night, defendant Gains went to visit 15-
year old Latrice Patterson, who lived with her grandmother.  He
arrived by car and appeared to be alone.  He spoke with her for
about 30 minutes and left.

The next morning, when Jonutz awoke, defendants Lozo and Gains
were still in her apartment along with co-defendant Bolds.  Lozo
was talking to Brian about the previous night.  He said he had
kicked down the door and was shooting and that Cook and Gains
had been outside the apartment somewhere.  He indicated that
inside the apartment there were "two guys sitting on the couch, and
one of them grabbed for a gun," and was trying to load it when
Lozo shot him.  Lozo referred to Kato as one of the men he shot

---

[2]  Kato testified that the shooter was about six feet tall, wearing dark clothing and a black
cap pulled down over his face.  He described the other two individuals as about the same height,
around six feet tall, wearing similar clothing and masks.  He testified that defendants Lozo,
Cook, and Gains fit the physical description by height and weight of the three masked men who
broke into his apartment that night.

and referred to the other victim as "Mexican."

That same morning following the shooting, Gomez and Lozo had a telephone conversation in which Lozo told Gomez they had gone inside the residence and shot both Kato and another man, and that he had shot Kato in the stomach.

Meanwhile, Fonseca and Kato were transported for emergency medical care.  Doctors were unable to save Fonseca.  Kato sustained a bullet wound to the chest, and underwent surgery to remove the bullet.  He recovered after being placed in intensive care.

Several days after the shootings, a story about the crime appeared in the newspaper.  Jonutz overheard defendants and Brian Cook discussing the article in which they said they wanted Kato to die but they had "shot the wrong guy."

Defendants were taken into custody on October 20, 1995.  Officers searched a vehicle parked at that apartment complex and found a plastic bag containing a maroon-colored shirt in the trunk.

When Detective Cabrera interviewed defendant Gains, Gains told Cabrera about the incident at Raley's involving Kato.  Gains recounted his activities on October 16th.  He indicated that he remained downtown that evening until Latrice Patterson paged him.  By then, it was late, but he went to her residence where they spoke for 30 to 60 minutes and he told her about the pistol-whipping incident.  Afterwards, he went to an apartment in Rancho Cordova where he spent the rest of the night.  Gomez was not present.

When asked about getting revenge for the pistol-whipping incident, Gains responded " . . . he pulled a gun on me, yeah, but I just didn't feel the need to go kill him because I didn't die, thank God, I didn't die."  Gains acknowledged ownership of the maroon-colored shirt seized from the trunk of the car parked at the apartment complex where he was arrested.  He also said he read about the shooting incident in the newspaper and " . . . [the shooting victim] got what he deserved . . . ."

On one occasion when Hale visited Gains in jail, he told her he had been involved in the incident in which Kato had been shot and a friend of Kato's had been killed.  He indicated that he and Gomez actually did it.  On a later visit, he told Hale he was not the person who actually did it, but that he was driving.  He also told Hale that defendant Cook was with him the night of the shooting.

In August or September 1996, Kato was incarcerated in the Sacramento County jail at the same time Lozo was being held.  During that time, Lozo told Kato not to testify and to say this was a

gang shooting.  Lozo also "tried to put a hit on [Kato] in the county jail."  Lozo told Kato he was "going to get what was coming to [him]," that Kato had "snitched on him" and not to go to court and testify.  Lozo told Kato he was going to pay someone around $500 to have Kato "touched up."  Lozo advised Kato to testify in court that " . . . it wasn't Tony and Matt, and them."[3]

## B.  The Defense

Defendant Gains did not testify, but he, along with defendant Cook, called a number of witnesses to challenge the prosecution's witnesses' testimony identifying defendants and describing the physical characteristics of the masked men and shooters.  The purpose of this evidence was to establish the wide variance between the height and weight of the masked men described by the eye witnesses and the defendants' actual height and weight.

Defendant Cook testified in his own behalf, putting on an alibi defense that included all three defendants and co-defendant Bolds.  He denied that he ever considered killing Kato.  According to Cook, Gomez approached him about getting revenge on Kato because he had fronted him some drugs and had not paid for them.  Gomez wanted to "beat [Kato's] ass" and Cook was willing to help him.  However, later, when Gomez told Cook that he had two guns, Cook told him he was not interested.  He and the other two defendants returned to Cook's apartment where they stayed the remainder of the night watching movies.  When Gomez telephoned them for a ride, he was told to call back.  The next morning, Gomez telephoned and said "I took care of him with my homies."

## II.   Procedural Background

In a four-count information, defendants[4] were charged in count 1 with conspiracy to commit murder with eight overt acts alleged[5] (Pen.Code, § 182),[6] in count 2 with murder (§ 187, subd. (a)), in count 3 with attempted murder committed with deliberation and premeditation (§§ 664/187, subd. (a)), and in count 4 with burglary of an inhabited dwelling.  (§ 459.)  As to each count it was alleged against defendants Cook and Gains that they were armed (§ 12022,

---

[3]  The jury was instructed that these statements were introduced only against Lozo and not against any of the other defendants.

[4]  Co-defendant Kenneth Jerome Bolds, Jr., was charged with the same offenses as defendants Cook, Gains, and Lozo, but was acquitted on all counts.

[5]  Overt act No. eight was subsequently stricken on the motion of the prosecution.

[6]  All further section references are to the Penal Code unless otherwise specified.

subd. (a)), and against defendant Lozo that he used a firearm. (§ 12022.5, subd. (a), § 1203.06, subd. (a)(1).)  Additionally, it was alleged against Lozo in count 3 that he personally inflicted great bodily injury on the victim. (§§ 12022.7, 1203.075.)  It was also alleged that the offenses charged in counts 2, 3, and 4 were serious felonies. (§ 1192.7, subds. (c)(1), (c)(18).)  Defendants Cook and Gains were also charged with having served a prior prison term. (§ 667.5, subd. (b).)

A jury found defendants not guilty of conspiracy to commit murder as charged, but guilty of the lesser offense of conspiracy to commit assault with a firearm, and guilty of first degree murder, attempted murder with premeditation and deliberation, and burglary.  The jury also found true the armed allegations against Cook and Gains, and the use of a firearm and great bodily injury allegations against Lozo.

Defendants Cook, Gains, and Lozo were sentenced on count 2 to 25 years to life and on count 3 to a consecutive life term. Defendants Cook and Gains were sentenced to an additional two years for the armed enhancements, and one year for the prior prison term enhancement, with the sentences on counts 1 and 4 stayed. (§ 654.)  Defendant Lozo was sentenced to an additional 23 years for the enhancements, with the sentences on counts 1 and 4 stayed. (§ 654.)

*People v. Cook*, 91 Cal.App.4th at 914-915.

## III.    Analysis

### A.  Standards for a Writ of Habeas Corpus

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents "if it 'applies a rule that contradicts the governing law set forth in [Supreme Court] cases', or if it 'confronts a set of facts that are materially

7

1  indistinguishable from a decision'" of the Supreme Court and nevertheless arrives at a different

2  result. *Early v. Packer*, 537 U.S. 3, 8 (2002) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-406

3  (2000)).

4        Under the "unreasonable application" clause of section 2254(d)(1), a federal habeas

5  court may grant the writ if the state court identifies the correct governing legal principle from the

6  Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's

7  case. *Williams*, 529 U.S. at 413. A federal habeas court "may not issue the writ simply because

8  that court concludes in its independent judgment that the relevant state-court decision applied

9  clearly established federal law erroneously or incorrectly. Rather, that application must also be

10 unreasonable." *Id.* at 412; *see also Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (it is "not

11 enough that a federal habeas court, in its independent review of the legal question, is left with a

12 'firm conviction' that the state court was 'erroneous.'")

13       The court looks to the last reasoned state court decision as the basis for the state court

14 judgment. *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002). *See also Barker v. Fleming*, 423

15 F.3d 1085, 1091 (9th Cir. 2005) ("When more than one state court has adjudicated a claim, we

16 analyze the last reasoned decision"). Where the state court reaches a decision on the merits but

17 provides no reasoning to support its conclusion, a federal habeas court independently reviews the

18 record to determine whether habeas corpus relief is available under section 2254(d). *Delgado v.*

19 *Lewis*, 223 F.3d 976, 982 (9th Cir. 2000).

20     **B. Petitioner's Claims**

21         **1. <u>Juror Misconduct</u>**

22       Petitioner's first ground for relief is that juror misconduct violated his right to a fair trial.

23 Pet. at 5-5(d).[7] The California Court of Appeal denied this claim, reasoning as follows:

24 ───────────────

25     [7] One of petitioner's claims on direct appeal was that prejudicial juror misconduct
  required reversal of his conviction. Opinion at 53. After that claim was denied, petitioner filed a

26 petition for review in the California Supreme Court, in which he raised the following claim:

Defendants contend prejudicial jury misconduct committed after one juror inadvertently overheard a statement made by defendant Gains to his attorney during trial requires reversal of their convictions. They claim the prejudicial impact of this statement cannot be rebutted because the statement contradicted their alibi defense and was not the type of information that a juror could disregard. The People contend the error, if any, was invited, there was no misconduct, and any presumption of prejudice was rebutted.[8] We find defendants were not prejudiced by the misconduct.

Jury misconduct is a mixed question of fact and law. We summarize the pertinent facts, accepting the trial court's credibility determinations and findings of historical fact where supported by substantial evidence. (*In re Carpenter* (1995) 9 Cal.4th 634, 646.)

On Monday morning, the third day of jury deliberations, the court clerk informed the trial judge that Juror 12 had left a message after adjournment the previous Friday asking to speak to the judge. The matter was taken up by the parties that same morning and Juror 12

---

"The Court of Appeal applied its own standard to the evaluation of juror misconduct, which deprived appellant of his right to a fair trial, requiring that this court grant review." Answer, Ex. D at 6. The petition for review was subsequently denied. *Id.* at consecutive p. 1. In this court, petitioner has essentially copied the caption of his argument to the California Supreme Court and used that caption to describe his juror misconduct claim in this court. Specifically, petitioner's first claim in the instant petition contains the following caption: "The Court of Appeals applied its own standard to the evaluation of juror misconduct which deprived appellant of his right to a fair trial requiring the court to review." Pet. at 5. Any claim that the California Court of Appeal used an incorrect standard to evaluate his claim of juror misconduct is not cognizable in the instant petition and should be denied. *See Gerlaugh v. Stewart*, 129 F.3d 1027, 1045 (9th Cir. 1997) (errors in state post-conviction review proceedings are not cognizable in federal habeas proceedings); *Franzen v. Brinkman*, 877 F.2d 26 (9th Cir. 1989) (same). In any event, a review of the facts supporting petitioner's claim reflects that he is actually raising a claim of juror misconduct, as he did in the California Court of Appeal. Accordingly, this court will analyze petitioner's claim of juror misconduct on the merits.

[8] Relying on *In re Hamilton* (1999), 20 Cal.4th 273, the People first argue the misconduct was invited. The doctrine of invited error is based upon the principle that a party cannot profit by his or her own wrongdoing. (*People v. Williams* (1988) 44 Cal.3d 1127, 1156.) In *Hamilton*, the court stated "we question whether a convicted person can ever overturn the verdict on grounds that persons acting in his behalf deliberately sought to influence the jury." (*Hamilton*, *supra*, 20 Cal.4th at p. 305, emphasis deleted.) As discussed below, here the misconduct was engendered by a remark made by defendant Gains to his attorney during the testimony of one of the prosecution's witnesses. Consequently, we fail to see how speaking to and consulting with one's own counsel about a witness's testimony while that testimony is being given constitutes "wrongdoing" or any kind. While Gains spoke in a volume that was loud enough to be heard by one juror, there is no evidence that in so doing he deliberately intended to influence the jury, nor that he was acting on behalf of the other defendants when he spoke. We therefore reject the People's claim the misconduct was invited.

was examined.  When asked what she had heard, the juror advised
the court as follows:

> "A: It was when Gomez was on the stand, and he
> was saying what happened in the back alley, and he
> had conveyed that Bolds was behind him, and that
> they ran out, and him and Bolds ran out across the
> alley.  And at that time I was looking at the
> Defendant Gains, and he turned to his lawyer, and
> he said, 'He's lying. Jose and I went this way, and
> Kenny ran this way.'

> "And at that time he looked over at me, and I
> believe Mr. McEwan looked over at me, and Mr.
> McEwan nudged him and said, "Write it down.'"

Juror 12 interpreted Gains' remark to mean that Gains and Bolds
were present at the scene of the crime.  The juror explained that
she "definitely heard, 'He's lying.'  I definitely saw him gesture
with his hands, and I believe that he did say, 'Kenny.'"  She had
some uncertainty about having heard the rest of the statements.
The juror told the court that just prior to recess on the previous
Friday, around 3:45 p.m., she told the other jurors what she had
told the court, although she also told them she could be wrong.

Juror 12 also advised the court that after she told the jury about
defendant Gains' statement, the jury foreman immediately
instructed the jurors to disregard the information and told Juror 12
she was wrong in sharing it with the jury.  Juror 12 testified that
the discussion was brief and the subject did not come up again
during deliberations the following Monday.  The court admonished
Juror 12 that the statement she overheard could not be considered
and she told the court she could disregard it in her deliberations.

Thereafter, the court and counsel conducted individual
examination of the other 11 jurors.  All 11 jurors recalled Juror 12
telling them about Gains' remark to his attorney.  The court
advised each juror that the jury would not be allowed to consider
this type of information and that they must decide the case based
only upon the evidence at trial.  The court also explained to each
juror that the matter was not to be considered as evidence because
it is unreliable hearsay, it could have been misinterpreted, and it
was not subject to examination and cross-examination so that each
party could respond to or address the matter.  Each of the 11 jurors
was again admonished to disregard the incident, was asked if he or
she could do so, and all indicated that they could do so.

However, when pressed on cross-examination as to whether this
information might have some influence on him in further
deliberations, Juror 11 stated, "I would like to think, no . . . I
would try my best," although he could not positively assure the

10

court that the matter would not have some impact on his deliberations.

The following day the court called the original 12 jurors back, again admonished them to disregard the information and asked whether anyone wanted to change or modify their answers. No one did. The court excused Juror Number 12 and an alternate juror was seated.

The court denied the motion for mistrial, stating while it believed Juror 12 could not be impartial, it was "impressed with the responses of the other jurors" and their general rejection of the validity of this type of evidence, the general acceptance of the principle that it could not be considered, and the fact the subject was not brought up again or debated.[9]

A defendant has a constitutional right to a trial by an impartial jury. (*Williams v. Florida* (1970) 399 U.S. 78, 102-103 [26 L.Ed.2d 446].) "'The requirement that a jury's verdict "must be based upon the evidence developed at the trial" goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury . . . . [¶] In the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the "evidence developed" against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel.'" (*People v. Nesler* (1997) 16 Cal.4th 561, 578, quoting *Turner v. Louisiana* (1965) 379 U.S. 466, 472-473 [13 L.Ed.2d 424] and *Smith v. Phillips* (1982) 455 U.S. 209, 217 [71 L.Ed.2d 78].)

Generally, juror misconduct involving the receipt of extraneous information about a party leads to a presumption of prejudice. (*People v. Marshall* (1990) 50 Cal.3d 907, 949-951.) A juror who is inadvertently exposed to information from a source other than evidence introduced at trial, while not necessarily involving blameworthy conduct, may still be guilty of "misconduct" giving rise to a presumption of prejudice, where exposure to the information poses the risk that one or more jurors may be "influenced by material that the defendant has had no opportunity to confront, cross-examine, or rebut." (*People v. Nesler*, *supra*, 16 Cal.4th at p. 579.)

On the other hand, a juror who, through no fault of his or her own, innocently considers evidence that was inadvertently provided by the court has not committed misconduct because that juror has not violated his or her oath. Thus it is not appropriate to impose the

---

[9]  The court also denied a motion for new trial on the basis of the juror misconduct, making a thoughtful and lengthy statement.

11

presumption of prejudice in such circumstances because no doubt is "cast on that person's ability to otherwise perform his duties." (*People v. Cooper* (1991) 53 Cal.3d 771, 835-836 [exhibit inadvertently admitted into evidence]; *see also People v. Jackson, supra*, 13 Cal.4th at pp. 1213-1214 [unedited version of transcript]; *People v. Clair* (1992) 2 Cal.4th 629, 667-668 [unredacted audiotape recording and transcript]; *People v. Rose* (1996) 46 Cal.App.4th 257, 264 [excluded police report inadvertently received by jury].)  In these innocent conduct cases, the matter is treated the same as if the evidence had been erroneously admitted. It is an error of state law subject to harmless error review under *People v. Watson, supra,* 46 Cal.2d at page 836.

Here, Juror 12 was inadvertently exposed to information outside the realm of "evidence" introduced at trial.  While her original exposure to this information was innocent, her failure to report the matter to the court at an earlier date is questionable.  Moreover, her decision to share that information with the other 11 jurors led to a violation of her oath to render a verdict based solely upon the evidence introduced at trial.  (CALJIC No. 1.03.)  The trial court found she could not be impartial and removed her from the panel and seated an alternate juror.  Therefore, because she was not a member of the jury [sic] that rendered the verdict, any presumption of prejudice as to Juror 12 was cured and clearly rebutted.

However, because Juror 12 disclosed to the remaining jurors information that was not introduced into evidence, she placed those jurors at risk of being "influenced by material that the defendant . . . had no opportunity to confront, cross-examine, or rebut."  (*People v. Nesler, supra,* 16 Cal.4th at p. 579.) Furthermore, it appears some of the other jurors may have wanted to hear the information despite having taken an oath and being instructed to render a verdict based solely upon the evidence introduced at trial.  (CALJIC No. 1.03.)  (*See People v. Hines* (1997) 15 Cal.4th 997, 1053 [no misconduct where juror refused to accept collect telephone call from defendant].)  Because defendants are entitled to be tried by 12 impartial unprejudiced jurors (*In re Carpenter, supra*, 9 Cal.4th at p. 652), we conclude the presumption of prejudice attaches.

When juror misconduct involves the receipt of information about a party from an extraneous source, the verdict will only be set aside if, after reviewing the entire record, "there appears a substantial likelihood of juror bias."  (*In re Carpenter, supra,* 9 Cal.4th at p. 653.)  Bias may appear in two ways.  The first may appear "if the extraneous material, judged objectively, is inherently and substantially likely to have influenced the juror."  (*Ibid.*)  The second appears where the court determines based upon the nature of the misconduct and the surrounding circumstances, there is a substantial likelihood the juror was "actually biased against the

defendant." (*Ibid.*)  If the court finds juror bias under either test, the judgment must be set aside.  (*Ibid.*)

Under the first test, the court may only find a juror inherently likely to be biased when "the extraneous information was so prejudicial in context that its erroneous introduction in the trial itself would have warranted reversal of the judgment."  (*In re Carpenter, supra*, 9 Cal.4th at p. 653.)  Under the "inherent prejudice" test, the appellate court must review the entire record to determine the prejudicial effect of the extraneous information. (*Ibid.*)  Moreover, even if the court finds the information was not inherently biasing under the first test, the court must still determine from the totality of the circumstances whether there is a substantial likelihood of actual bias under the second test.  (*Id.* at p. 654.)

"'The presumption of prejudice may be rebutted, inter alia, by a reviewing court's determination, *upon examining the entire record*, that there is no substantial likelihood that the complaining party suffered actual harm.' [Citation omitted.] [¶] In an extraneous-information case, the 'entire record' logically bearing on a circumstantial finding of likely bias includes the nature of the juror's conduct, the circumstances under which the information was obtained, the instructions the jury received, the nature of the evidence and issues at trial, and the strength of the evidence against the defendant . . .  the stronger the evidence, the less likely it is that the extraneous information itself influenced the verdict." (*In re Carpenter, supra*, 9 Cal.4th at p. 654, orig. emphasis.)

In this case, we think that presumption was rebutted and that the remaining jurors were capable and willing to decide the case solely on the evidence.  We recognize that in the abstract, the information had the potential to be highly prejudicial because, as defendants argue, it completely contradicted their alibi defense.  Nevertheless, we think under the totality of the circumstances in which the statement was heard and disclosed to the jury, the prejudicial impact was sufficiently dissipated by several factors.  Those include the fact the statement was made as a brief whisper overheard by only one juror who admitted she may not have heard the statement clearly; by the jurors themselves who recognized the statement was unreliable hearsay and may have been misunderstood, by the foreman who instructed the jurors not to consider it, and by the court when it admonished each juror individually to disregard the statement, explaining at length why it was unreliable, pointing out that the information had not been subject to cross-examination or explanation, and may very well have been misheard or misunderstood by Juror Number 12.  The jurors' angry response to Juror Number 12 and their brief and singular discussion of the matter further attest to their ability to disregard the information.  When examined by the court, each juror testified he or she understood the information was not evidence and assured the court he or she could disregard the

information.[10]

Furthermore, the jury acquitted co-defendant Bolds of all charges although the information disclosed by Juror 12 clearly placed Bolds at the scene of the crime.  While defendants attempt to minimize the significance of this fact, arguing that the evidence against Bolds was very limited and that Juror Number 12 was not sure she heard Gains say "Kenny," we think Bolds' complete acquittal on all charges strongly supports the conclusion the jury was able to disregard the information disclosed to them by Juror Number 12.

Moreover, we think there was overwhelming evidence of defendants' presence at the scene of the crime established by strong evidence of motive, and pre-crime and post-crime admissions and confessions and conduct, further rebuts any prejudice stemming from the information disclosed to the jury.

Evidence that implicates all three defendants includes statements by each defendant to various people about their anger regarding the pistol-whipping incident, that they were going to take revenge against Kato using a gun, and their statements made while they were discussing a newspaper article about the crimes in which they said the person they wanted to die, Kato, did not die, and that they had shot the wrong person.  There was also evidence that Jonutz saw all three defendants leave her apartment just prior to the shootings with three black knit caps with eye holes that had been cut out by Brian Cook, and Jose Gomez testified that all three defendants were present at the scene of the shooting.

Evidence that overwhelmingly established defendants' guilt individually includes their own statements of admission or inculpatory conduct.  With respect to defendant Cook that evidence includes his statement to Tomesia Hale about the pistol-

---

[10]  Defendants argue the response by Juror Number 11 to the question whether this information may have some influence on his further deliberations indicates at least one juror was not able to disregard the statement.  We disagree.  In response to the question, this juror testified that he would like to think the information would not have some influence, he would try his best, but he could not assure the court that it would not.  We think this statement is the statement of an honest juror who was not willing to guarantee absolute perfection.  But, as the court in *In re Carpenter, supra,* 9 Cal.4th 634, cautioned, perfection is not required.  Before a verdict may be set aside, the "likelihood of bias . . . must be substantial . . . the criminal justice system must not be rendered impotent in quest of an ever-elusive perfection . . . .  If the system is to function at all, we must tolerate a certain amount of imperfection short of actual bias.  To demand theoretical perfection from every juror during the course of a trial is unrealistic." (*Id.* at pp. 654-655, emphasis deleted.)  Juror Number 11 knew what was expected of him, understood that the information was hearsay and inherently unreliable, and as discussed above, was able to render a verdict acquitting co-defendant Bolds of all charges.  We do not think these circumstances establish a "substantial likelihood" that Juror Number 11 was biased.

whipping incident followed by the statement, "[t]hat's okay, I'm coming back"; his statement to defendant Gains that he got the mask; his presence in JNJ Gold where he was seen purchasing the knit caps that were used in the commission of the crimes; Jonutz's testimony that on the evening of October 16th, defendant Cook showed her a handgun which he described as a .38 Special revolver and said he had bought it earlier that day for about $250 to $300, while the ballistics evidence established that a .38 caliber weapon had been used to shoot the bullets that killed Fonseca and wounded Kato; statements made to Brian Cook 45 minutes after the shooting when defendant Cook and defendant Gains told Brian that they had going to Kato's house, kicked down the door and started shooting; and evidence of a consciousness of guilt when Cook threatened Jonutz and Brian Cook.

Evidence that established defendant Lozo's guilt includes evidence that on October 16th, he was seen going with Gomez to get a gun from a nearby car; the statement he made 45 minutes after the crimes were committed, when Lozo arrived at Brian's apartment and told the group he had kicked in the door and was shooting,[11] the statement he made the following morning when he told Brian he had kicked down the door and was shooting, boasting that he shot both victims in the chest, and the statement he made to Gomez that same morning during a telephone conversation in which he told Gomez they had gone inside the residence and shot both Kato and another man, and that he shot Kato in the stomach. Medical testimony confirmed both victims had been shot in the chest, and that Fonseca also sustained wounds to his abdomen. There was also evidence Lozo threatened Kato while they were both in the county jail, warning him not to testify against him.

Evidence establishing defendant Gains' guilt includes his statement to police admitting the maroon-colored shirt worn by one of the masked shooters belonged to him, his two statements to Hale while he was in jail when he told her he had been involved in an incident in which Kato was shot and a friend of Kato's was killed. In his first statement to Hale, he told her he and Gomez actually committed the crimes, in his second statement he said he had been the driver in an incident in which Kato was shot and a friend of Kato's had been killed. Gains also made statements to

---

[11]  We have omitted from this summary of damning evidence the statement Lozo made to Brian Cook immediately after the crimes, and overheard by Kami Jonutz when he telephoned Brian and told him "I did it. The job's done. I shot them." We do so because Lozo contends on appeal that this statement was erroneously introduced into evidence in violation of California's Invasion of Privacy law. (*See* §§ 631, et seq.) As discussed in part III C of this opinion, we did not determine whether the evidence was erroneously introduced because we concluded any error in admitting the evidence was harmless (*People v. Watson, supra*, 46 Cal.2d at p. 836.) Nevertheless, to preserve the reliability of our determination on the present contention, we omit the statement from the evidence we consider in making this determination.

himself in the county jail when he said, "I can't handle it, man. They want me to tell. I'm not going to tell" and his statements to Hale a short time later when he said, "Do you know what these people want me to do? . . . '[t]hey want me to sit here and . . . have me tell them what happened on Monday night. And if I don't tell them, I'm a suspect."

Moreover, contrary to defendants' assertions, the reliability of the key prosecution witnesses' testimony turned less on their personal credibility and more on the inherent reliability of their testimony because it was consistent with the physical evidence and with the testimony of the numerous other witnesses who had no connection to each other and no motive to lie. We therefore find the sheer volume and interconnectedness of the prosecution's evidence established an overwhelming case against defendants apart from the testimony of any one witness.

In sum, because of the nature of the misconduct, the circumstances under which defendant Gains' statement was heard and disclosed, the court's strong and persuasive admonition to each juror to disregard the information, the assurances given by the 11 jurors who remained on the panel that they could disregard the information and the trial court's belief in these assurances, the fact the jury acquitted co-defendant Bolds, and the overwhelming evidence against defendants, we think the presumption of prejudice was clearly rebutted.

Opinion at 53-67.

After the California Court of Appeal issued this opinion, petitioner's co-defendant Cook subsequently raised this juror misconduct claim in petitions for a writ of habeas corpus filed in this court and in the Ninth Circuit Court of Appeals. In a published opinion the Ninth Circuit rejected the claim, reasoning as follows:

Finally, we consider whether Cook suffered a violation of his Sixth Amendment right to an impartial jury. On the third day of deliberations, Juror 12 informed the judge that she had overheard a conversation between co-defendant Gomez [sic] and his attorney about two weeks earlier. Juror 12 believed the statements indicated the defendants were all present at the scene, which, if true, would seriously undermine their alibi defense.

Under the Sixth Amendment, Cook has a constitutional right to an impartial jury, the right to confront those who testify against him, and the right to conduct cross-examination. *See Duncan v. Louisiana*, 391 U.S. 145, 149, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968); *Pennsylvania v. Ritchie*, 480 U.S. 39, 51, 107 S.Ct. 989, 94

16

L.Ed.2d 40 (1987); *Turner v. Louisiana*, 379 U.S. 466, 472-73, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965). The California Court of Appeal found, and the state does not dispute, that the incident here constituted jury misconduct.  The Court of Appeal presumed prejudice but concluded the error was harmless because the prejudice was "sufficiently dissipated by several factors."

We review this finding de novo as a mixed question of law and fact.  *See Sassounian v. Roe*, 230 F.3d 1097, 1108 (9th Cir. 2000). Cook is entitled to habeas relief only if the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993).  In making this determination, we consider the following factors:

> (1) whether the extrinsic material was actually received, and if so, how; (2) the length of time it was available to the jury; (3) the extent to which the jury discussed and considered it; (4) whether the material was introduced before a verdict was reached, and if so, at what point in the deliberations it was introduced; and (5) any other matters which may bear on the issue of . . . whether the introduction of extrinsic material [substantially and injuriously] affected the verdict.

*Lawson v. Borg*, 60 F.3d 608, 612 (9th Cir.1995) (alterations in original) (quoting *Bayramoglu v. Estelle*, 806 F.2d 880, 887 (9th Cir. 1986)).  Within the fifth factor, we look to other considerations that "might nonetheless suggest that the potential prejudice of the extrinsic information was diminished in a particular case." *Sassounian*, 230 F.3d at 1109 (quoting *Jeffries v. Wood*, 114 F.3d 1484, 1491 (9th Cir.1997) (en banc), *overruled on other grounds* by *Lindh v. Murphy*, 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997)).  These considerations may include:

> (1) whether the prejudicial statement was ambiguously phrased; (2) whether the extraneous information was otherwise admissible or merely cumulative of other evidence adduced at trial; (3) whether a curative instruction was given or some other step taken to ameliorate the prejudice; (4) the trial context; and (5) whether the statement was insufficiently prejudicial given the issues and evidence in the case.

*Id.*

There is no question that the information was actually received before the jury reached a verdict.  However, the other factors

17

1       support the conclusion that the misconduct was not prejudicial.
    Juror 12 told the other jurors about the incident at 3:45 p.m. on
2       Friday.  The foreperson immediately told the other jurors to
    disregard the information and told Juror 12 that she was wrong to
3       share it.  The jury stopped deliberating ten minutes later.  Juror 12
    left a message for the trial judge the same day, and he addressed it
4       first thing on Monday morning.

5       More importantly, the trial judge conducted a full hearing and
    questioned each juror individually. "[T]he Supreme Court has
6       stressed that the remedy for allegations of jury bias is a hearing, in
    which the trial court determines the circumstances of what
7       transpired, the impact on the jurors, and whether or not it was
    prejudicial." *United States v. Dutkel*, 192 F.3d 893, 899 (9th
8       Cir.1999) (internal quotation marks omitted).  Each juror,
    including Juror 12, indicated he or she could disregard the
9       statement.  Out of an abundance of caution, the trial court
    dismissed Juror 12.  The hearing revealed that the jurors perceived
10      the comment as minor in light of the entire body of trial evidence.
    As Juror 4 noted, "There's certainly a lot of evidence to consider in
11      this trial without considering or giving any wait [sic] to that
    comment."

12
    Finally, the jury was instructed to base its decision on the facts and
13      the law as stated by the judge, and admonished to disregard the
    extrinsic information.  We presume that jurors follow the
14      instructions given, *Weeks v. Angelone*, 528 U.S. 225, 234, 120
    S.Ct. 727, 145 L.Ed.2d 727 (2000), and there is no evidence in the
15      record that the jury failed to do so here.  The district court
    correctly concluded that Juror 12's misconduct did not have a
16      substantial or injurious effect on the jury's verdict.

17  *Cook v. LaMarque*, 593 F.3d 810, 826 -828 (9th Cir. 2010).

18          This court must defer to the holding of the Ninth Circuit on this claim pursuant to the

19  doctrine of law of the case.  Under that doctrine, "a court is generally precluded from

20  reconsidering an issue that has already been decided by the same court, or a higher court in the

21  identical case." *Thomas v. Bible*, 983 F.2d 152, 154 (9th Cir. 1993).  *See also United States v.*

22  *Schaff*, 948 F.2d 501, 506 (9th Cir. 1991) (doctrine of law of the case "precludes a court from

23  re-examining issues previously decided by the same court," and is applicable to co-defendants

24  convicted at the same trial when the appeal of one co-defendant is decided prior to the appeal of

25  another co-defendant); *United States v. Tierney*, 448 F.2d 37, 39 (9th Cir. 1971) (law of case

26  established on appeal by first defendant applied to suppression issue raised in separate appeal by

1  co-defendant).  Assuming *arguendo* that the doctrine of law of the case does not apply in this

2  situation because the juror misconduct claim was decided in the context of two habeas actions as

3  opposed to two direct appeals, this court agrees with the analysis of the Ninth Circuit and

4  concludes, for the reasons expressed by the Ninth Circuit, that petitioner was not prejudiced by

5  juror misconduct in this case.  The decision of the California Court of Appeal to the same effect

6  is not contrary to or an unreasonable application of federal law.  Accordingly, petitioner is not

7  entitled to relief on this claim.

8  ### 2. **Exclusion of Evidence of Third-Party Culpability**

9          In his second claim, petitioner argues that the trial court violated his right to due process

10  when it excluded evidence of third-party culpability.  Pet. at 5, 5(d)-5(h).

11  ### a. **State Court Opinion**

12          The California Court of Appeal denied this claim, reasoning as follows:

13          Defendants contend the trial court committed reversible error by
            excluding proffered evidence of third party culpability that
14          restricted their ability to present a defense and deprived them of
            their constitutional right to a fair trial.  The People contend the trial
15          court properly excluded the evidence.  We agree with the People.

16          Counsel for defendant Cook, Mr. Masuda, proffered evidence that
            Jose Gomez was involved with a gang.  He made an offer of proof
17          that Kato was involved with an Asian gang which was a rival of
            Gomez's gang and argued this evidence would support the defense
18          theory that Gomez was the actual shooter and the offenses were
            gang shooting in retribution for some past unstated involvement
19          between the two gangs.  Masuda pointed to testimony given by
            defense witness Reynaldo Escamilla, who described one of the
20          people he saw at the crime scene as Asian, and told the court he
            wanted to start by recalling Escamilla.  The trial court indicated it
21          would require a stronger offer of proof and a more detailed
            explanation in support of the defense theory.
22
            Masuda subsequently raised the issue again, seeking to call Gomez
23          for the purpose of questioning him about his gang activity.  While
            acknowledging he only had secondhand information that Gomez
24          was a gang member, Masuda based his request to explore Gomez's
            gang affiliation upon defendant Cook's testimony that Gomez
25          made a statement to him in which he took responsibility for the
            shooting with his "homies."  Counsel for defendant Gains argued
26          that, in light of that testimony, he also wanted to recall Gomez to

inquire who his "homies" might be and whether they are gang members, so he could argue "it's not improbable that Mr. Gomez could easily find some people to go with him to participate in this." Counsel for defendant Lozo made a similar argument.

The court denied the defense request to introduce evidence of gang activity by Gomez stating it had made "a very flimsy showing" that was weak in substance and rested on the credibility of defendant Cook who had a "motive . . . to protect himself." The court found there had been an insufficient showing that Gomez was actively involved in a pattern of criminal gang activity. To the contrary, his criminal history involved some of the defendants as well as persons other than gang members.[12] The trial court also found there was no evidence that the present offenses were gang related and concluded that bringing in evidence of gang association would be "extremely prejudicial to the People's case."

A criminal defendant has a right to present evidence of third party culpability if the evidence is capable of raising a reasonable doubt about the guilt of the defendant. (*People v. Hall* (1986) 41 Cal.3d 826, 833.) This rule does not require "that any evidence, however remote, must be admitted to show a third party's possible culpability . . . . [E]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." (*Ibid.*)

Evidence of third party culpability is subject to the same standards for admitting other exculpatory evidence: it must be relevant under Evidence Code section 350 and it is subject to exclusion under Evidence Code section 352, where "its probative value is substantially outweighed by the risk of undue delay, prejudice, or confusion." [Citation.]" (*People v. Hall, supra*, 41 Cal.3d at p. 834.)

Instructive is *People v. Sandoval*, (1992) 4 Cal.4th 155, where the court held evidence of third party culpability was properly excluded. The defense had sought to prove the murder victim was the center of a violent criminal operation involving drugs, stolen cars, and guns, and that any number of accomplices or rivals could have killed him. In support of this theory, the defense sought to cross-examine a police officer about the names found in the victim's appointment book and weekly planner and to introduce that document into evidence. The court held this evidence only

---

[12] The trial court noted that the parties had explored Gomez's criminal activity rather extensively and if he was in fact somebody who ran with a gang and his activities were connected closely with gang activities, there would have been a pattern that one could demonstrate, but none had been shown.

raised the possibility that others had a motive to kill the two victims.  Although the defense had identified two people who had a plausible motive, there was no direct or circumstantial evidence linking them to the actual perpetration of the crime.  (*Id.* at pp. 176.)

Likewise, we also find the proffered evidence was properly excluded.  (*People v. Sandoval, supra*, 4 Cal.4th at pp. 176-177; *see also People v. Edelbacher* (1989) 47 Cal.3d 983, 1017-1018; *People v. Kaurish* (1990) 52 Cal.3d 648, 684.)

The sole basis for the third party culpability defense was defendant Cook's self-serving hearsay statement that Gomez admitted committing the offenses with his "homies."  The trial court found this statement lacked credibility because it was based on the testimony of defendant Cook who had a "motive . . . to protect himself."  Generally, the California Supreme Court has warned trial courts to leave questions of credibility to the jury when assessing the admissibility of third party culpability evidence.  (*People v. Cudjo* (1993) 6 Cal.4th 585, 610; *People v. Hall, supra*, 41 Cal.3d at p. 834.)  However, an exception exists where the offer of proof is based upon hearsay testimony that lacks sufficient trustworthiness because it is motivated by threats, bribery, or expectation of personal advantage.  (*People v. Cudjo, supra; see People v. Blankenship* (1985) 167 Cal.App.3d 840, 849; *People v. Martin* (1983) 150 Cal.App.3d 148, 162; *People v. Chapman* (1975) 50 Cal.App.3d 872, 878.)

We think defendants' offer of proof falls into this exception because it is based solely on the self-serving hearsay statement introduced through the testimony of defendant Cook who certainly stood to gain from the alleged hearsay statement by Gomez.  Because the trial court would have had discretion to exclude the hearsay statement under these circumstances, we think the trial court properly considered the trustworthiness of this statement as a factor in determining the sufficiency of the offer of proof based upon this statement.

Moreover, the offer of proof was insufficient as a matter of law to raise a reasonable doubt.  The defense failed to offer any evidence that Gomez was actively involved in criminal gang activity or that the offenses were gang related.  Indeed, defense counsel only sought to "inquire" or "explore" the extent of Gomez's gang affiliations.  The mere alleged reference by Gomez to "his homies" did not, without more, establish that these "homies" were gang members.  Moreover, there was no evidence that any of these "homies" had an actual motive to commit the crimes.  At most, evidence of Gomez's gang association may have raised a possibility that others had a motive to kill the victims based solely upon their gang allegiance to Gomez.  However, there was no direct or circumstantial evidence linking a third person who was

1      one of Gomez's "homies" to the actual perpetration of the crime.

2           For these reasons, we find the proffered evidence was insufficient
3      to raise a reasonable doubt of guilt and the trial court did not abuse
       its discretion in excluding the evidence.

4  Opinion at 40-45.

5                          **b.  Applicable Law**

6           Due process includes a criminal defendant's right to "a meaningful opportunity to

7  present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (citation and internal

8  quotations omitted).  Evidence of potential third-party culpability must be admitted when, under

9  the "facts and circumstances" of the individual case, its exclusion would deprive the defendant

10 of a fair trial.  *Chambers v. Mississippi*, 410 U.S. 284, 303 (1973).  The Court of Appeals for the

11 Ninth Circuit has determined that where the proffered evidence simply affords a possible ground

12 of suspicion pointing to a third party and does not directly connect that person with the actual

13 commission of the offense, that evidence may be excluded.  *See People of Territory of Guam v.*

14 *Ignacio*, 10 F.3d 608, 615 (9th Cir. 1993) (citing *Perry v. Rushen*, 713 F.2d 1447, 1449 (9th Cir.

15 1983)).  *See also Lunbery v. Hornbeak*, 605 F.3d 754, 760-61 (9th Cir. 2010) (exclusion of

16 statement by third party that he had killed defendant's husband deprived defendant of the right to

17 present a defense because the "excluded testimony . . . bore substantial guarantees of

18 trustworthiness and was critical to [defendant's] defense").  Under California law, a criminal

19 defendant has a right to present evidence of third party culpability if it is capable of raising a

20 reasonable doubt regarding his own guilt.  *See Spivey v. Rocha*, 194 F.3d 971, 978 (9th Cir.

21 1999) (citing *People v. Hall*, 41 Cal. 3d 826, 833 (1986)).  In order for evidence pointing to

22 another suspect to be admissible, however, "there must be direct or circumstantial evidence

23 linking the third person to the actual perpetration of the crime."  *Hall*, 41 Cal. 3d at 833.  Motive

24 or opportunity is not enough.  *Id.*

25 ////

26 ////

                                          22

1

**c.  Discussion**

2  As set forth above, the California Court of Appeal found the proffered evidence of third-

3  party culpability inadmissible because it was speculative, lacked sufficient probative value to

4  raise a reasonable doubt of petitioner's guilt, and was based on unreliable self-serving hearsay

5  statements by Cook.  Opinion at 43-45.  These conclusions are not unreasonable.  At most, the

6  evidence affords a possible ground of suspicion pointing to unknown persons and does not

7  directly connect any person with the actual commission of the offense.  Under these

8  circumstances, neither the California rule of evidence requiring sufficient evidence linking the

9  third person to the crime, nor its application by the trial court in this case, constitutes a federal

10  due process violation.  Therefore, the appellate court's decision rejecting petitioner's claim did

11  not involve an unreasonable application of clearly established United States Supreme Court

12  authority.  *See Holmes v. South Carolina*, 547 U.S. 319, 327 (2006) (acknowledging the right of

13  a state court to exclude defense evidence that is too "remote [or] lack[s] such connection with the

14  crime" to raise a reasonable doubt as to the accused's guilt).  Accordingly, petitioner is not

15  entitled to relief on this claim.

16

**3.  Jury Instruction Error**

17  Petitioner raises two claims of jury instruction error.  After setting forth the applicable

18  legal principles, the court will evaluate these claims in turn below.

19

**a.  Applicable Legal Standards**

20  In general, a challenge to jury instructions does not state a federal constitutional claim.

21  *Engle v. Isaac*, 456 U.S. 107, 119 (1982); *Gutierrez v. Griggs*, 695 F.2d 1195, 1197 (9th Cir.

22  1983).  In order to warrant federal habeas relief, a challenged jury instruction "cannot be merely

23  'undesirable, erroneous, or even "universally condemned,"' but must violate some due process

24  right guaranteed by the fourteenth amendment."  *Prantil v. California*, 843 F.2d 314, 317 (9th

25  Cir. 1988) (quoting *Cupp v. Naughten*, 414 U.S. 141, 146 (1973)).  To prevail on such a claim

26  petitioner must demonstrate "that an erroneous instruction 'so infected the entire trial that the

1  resulting conviction violates due process.'"  *Prantil*, 843 F.2d at 317 (quoting *Darnell v.*

2  *Swinney*, 823 F.2d 299, 301 (9th Cir. 1987)).  In making its determination, this court must

3  evaluate the challenged jury instructions "'in the context of the overall charge to the jury as a

4  component of the entire trial process.'"  *Id.* (quoting *Bashor v. Risley*, 730 F.2d 1228, 1239 (9th

5  Cir. 1984)).

6  ### b. <u>Jury Instruction on Conspiracy</u>

7  In his third claim, petitioner argues that the trial court violated his right to notice of the

8  charges against him and to due process by instructing the jury on conspiracy to commit assault

9  with a deadly weapon as a lesser included offense of the crime of conspiracy to commit murder.

10  Pet. at 6-6a.

11  ### I. <u>State Court Decision</u>

12  In the published portion of its decision on petitioner's direct appeal, the California Court

13  of Appeal rejected this claim, reasoning as follows:

> Relying on *People v. Fenenbock* (1996) 46 Cal.App.4th 1688 [54
> Cal.Rptr.2d 608], defendants contend the trial court violated their
> right to notice and due process by instructing the jury that if they
> had a reasonable doubt that defendant was guilty of conspiracy to
> commit murder, they could convict him of the lesser included
> offense of conspiracy to commit assault with a firearm. We
> disagree.
>
> In the published portion of the opinion (footnote omitted), we hold
> the trial court may look to the overt acts pleaded in a charge of
> conspiracy to determine whether the charged offense includes the
> lesser included offense.  Under the accusatory pleading test for
> determining lesser included offenses, we find that conspiracy to
> commit assault by means of a firearm is a lesser included offense
> of conspiracy to commit murder as that offense was pleaded in the
> accusatory pleading. The overt acts alleged in the information gave
> notice to defendants of the lesser included offense, and the
> defendants do not claim the facts shown at the preliminary hearing
> failed to give them notice of the lesser offense or that they were
> surprised by the evidence presented at trial.
>
> * * *
>
> Relying on *People v. Fenenbock, supra,* (hereafter *Fenenbock*),
> defendant Gains, joined by defendants Cook and Lozo, contends

the trial court violated his right to notice and due process by instructing the jury that if they had a reasonable doubt that defendant was guilty of conspiracy to commit murder, they could convict him of the lesser included offense of conspiracy to commit an assault with a firearm.  This error, he claims, requires that his conviction for conspiracy to commit assault with a firearm be reversed.  The People concede instructional error and request that defendants' convictions for conspiracy to commit assault with a firearm be reversed.

We disagree with both parties and find no error.

**A.**

The facts relevant to the defendants' claim are as follows.  In an incident in a Raley's parking lot between Jimmie Fonseca, the murder victim, Carl Kato, the surviving victim, and defendant Cook, Fonseca struck defendant Cook on the head several times with a gun, knocking him down.  A day or so later, defendants Cook, Gains, and Lozo all appeared angry about the pistol-whipping incident and spoke about getting revenge on Kato.

On the day of the shootings, Cook told Jose Gomez, an acquaintance of his, that he was looking for a gun, so Gomez introduced Cook and Lozo to one of his friends who sold the two-some a .38 special revolver for about $200.  Later, Gomez and defendants purchased knit caps to use when they went to Kato's apartment.

Defendants returned to Cook's apartment, where Cook showed Kami Jonutz, his brother's girlfriend, the .38 Special revolver.  Defendants spoke about using it that night to get revenge on Kato.  Brian Cook, defendant Cook's brother, cut eye holes in the recently purchased caps and gave them to defendants.  The three defendants left the apartment and around 9:45 p.m. they, along with co-defendant Bolds, met Gomez in an alley near the victims' apartment.  They were all wearing baggy clothing and had the ski caps pulled down over their faces.  Gomez and defendant Lozo were both armed.  Lozo had the .38 special revolver he had purchased earlier that day.  When the group approached the victims' apartment, Gomez thought he saw someone with a gun peering out through the window, whereupon Gomez and Bolds fled down the alleyway.

Undeterred, defendants Cook, Gains, and Lozo forced open the apartment door.  Lozo went into Fonseca's bedroom, found him sitting in a chair beside the window, and shot at him, stating, "[d]ie mother fucka, die."  When Fonseca fell to the floor, Lozo shot him again.  Next, defendants went to Kato's bedroom where Kato was sleeping.  They kicked open the locked door and shot twice, hitting him in the chest.  Fonseca died from his injuries; Kato survived

25

after being placed in intensive care.

**B.**

Defendants were charged with conspiracy to commit murder, and the trial court instructed the jury using a modified version of CALJIC Nos. 6.10 and 8.69.  The jury was instructed in pertinent part as follows:

> "... the information charged conspiracy to commit murder.  If you are not satisfied beyond a reasonable doubt ultimately in this case, after hearing the arguments, et cetera, if you are not satisfied beyond a reasonable doubt that a defendant is guilty of conspiracy to commit murder, you may nevertheless convict him of a lesser crime, if you are convinced beyond a reasonable doubt that the defendant is guilty of the lesser crime.

> "The crime of conspiracy to commit an assault with a firearm is lesser to that of conspiracy to commit murder, and I will give further instructions on the process whereby you would consider a lesser charge.

> "Now that I have explained the alternatives you will have in connection with Count 1, let me go back and define the charge.

> "As I just stated, conspiracy is an agreement entered into by two or more persons with the specific intent to agree to commit the crime of murder, or the crime of assault with a firearm, and with the further specific intent to commit the crime charged, murder, or the lesser crime, assault with a firearm.

> "The agreement must be followed by an overt act committed by one or more of the parties for the purpose of accomplishing the object of the agreement."

It is well established that even in the absence of a request, the trial court has a sua sponte duty to instruct on lesser included offenses when there is substantial evidence the defendant is guilty only of the lesser offense.  (*People v. Birks* (1998) 19 Cal.4th 108, 118, 77 Cal.Rptr.2d 848, 960 P.2d 1073.)  This requirement is based upon the rule that "the court must instruct sua sponte on 'the "general principles of law governing the case;" 'i.e., those ' "closely and openly connected with the facts of the case before the court."' [Citations.]"  (*People v. Birks, supra,* 19 Cal.4th at p. 118, 77 Cal.Rptr.2d 848, 960 P.2d 1073, quoting *People v. Hood* (1969) 1

Cal.3d 444, 449, 82 Cal.Rptr. 618, 462 P.2d 370; *see also People v. Wilson* (1967) 66 Cal.2d 749, 759, 59 Cal.Rptr. 156, 427 P.2d 820; *People v. Putnam* (1942) 20 Cal.2d 885, 890-891, 129 P.2d 367.)  More recent cases have found the requirement is based upon the defendant's "'constitutional right to have the jury determine every material issue presented by the evidence.'" (*People v. Birks, supra*, 19 Cal.4th at p. 119, 77 Cal.Rptr.2d 848, 960 P.2d 1073, quoting *People v. Sedeno* (1974) 10 Cal.3d 703, 720, 112 Cal.Rptr. 1, 518 P.2d 913.)

This instructional rule benefits both the prosecution and the defense.  (*People v. Barton* (1995) 12 Cal.4th 186, 194 195, 47 Cal.Rptr.2d 569, 906 P.2d 531.)  It "ensures that the jury will be exposed to the full range of verdict options which, by operation of law and with full notice to both parties, are presented in the accusatory pleading itself and are thus closely and openly connected to the case.  In this context, the rule prevents either party . . . from forcing an all-or-nothing choice between conviction of the stated offense on the one hand, or complete acquittal on the other.  Hence, the rule encourages a verdict, within the charge chosen by the prosecution, that is neither 'harsher [n]or more lenient than the evidence merits.'" (*People v. Birks, supra*, 19 Cal.4th at p. 119, 77 Cal.Rptr.2d 848, 960 P.2d 1073, orig. emphasis.)

To determine whether a lesser offense is necessarily included in a greater charged offense, one of two tests must be met.  (*People v. Lopez* (1998) 19 Cal.4th 282, 288, 79 Cal.Rptr.2d 195, 965 P.2d 713.)  The "elements" test is satisfied if the statutory elements of the greater offense include all the elements of the lesser offense so that the greater offense cannot be committed without committing the lesser offense.  (*People v. Birks, supra*, 19 Cal.4th at p. 117, 77 Cal.Rptr.2d 848, 960 P.2d 1073.)  The "accusatory pleading" test is satisfied if "the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater [offense] cannot be committed without also committing the lesser [offense]." (*Ibid.*)

In the case before us, the trial court instructed the jury that conspiracy to commit assault with a firearm was a lesser included offense of the charged offense of conspiracy to commit murder.

A conspiracy is an agreement by two or more persons to commit any crime.  (§ 182; *People v. Morante* (1999) 20 Cal.4th 403, 416, 84 Cal.Rptr.2d 665, 975 P.2d 1071.)  A conviction for conspiracy requires proof of four elements: (1) an agreement between two or more people, (2) who have the specific intent to commit a public offense, (3) the specific intent to commit that offense, and (4) an overt act committed by one or more of the parties to the agreement for the purpose of carrying out the object of the conspiracy.  (§§ 182, subd. (b), 184; *People v. Morante, supra*, 20 Cal.4th at p. 416,

84 Cal.Rptr.2d 665, 975 P.2d 1071; *People v. Herrera* (1999) 70 Cal.App.4th 1456, 1464, 83 Cal.Rptr.2d 307; *People v. Liu* (1996) 46 Cal.App.4th 1119, 1128, 54 Cal.Rptr.2d 578; *People v. Sconce* (1991) 228 Cal.App.3d 693, 700, 279 Cal.Rptr. 59; *Feagles v. Superior Court* (1970) 11 Cal.App.3d 735, 739, 90 Cal.Rptr. 197; Witkin & Epstein, *Cal.Criminal Law* (3d ed.2000) *Elements*, § 90, p. 306.)

Under section 182, the jury must determine which felony the defendants conspired to commit, and it cannot make that determination unless it is instructed on the elements of the target offense charged as well as the elements of any lesser included target offense which the jury could reasonably find to be the object of the conspiracy.  (*People v. Horn* (1974) 12 Cal.3d 290, 297, 115 Cal.Rptr. 516, 524 P.2d 1300.)  Thus, the trial court has a sua sponte duty to instruct the jury on a lesser included target offense if there is substantial evidence from which the jury could find a conspiracy to commit the offense.

In the present case, defendants were charged with conspiracy to commit murder and the trial court had a sua sponte duty to instruct on the lesser included offenses of the target offense of murder. However, as the parties both correctly point out, since violence is not an element of murder, under the statutory definition of murder and the statutory test for lesser included offenses, assault with a firearm is not a lesser included offense of murder.  (*People v. Dixie* (1979) 98 Cal.App.3d 852, 856, 159 Cal.Rptr. 717; *People v. Benjamin* (1975) 52 Cal.App.3d 63, 71, 124 Cal.Rptr. 799.)

We reach a different result applying the "accusatory pleading" test. Count 1 of the information charged defendants with conspiracy to commit murder, alleging seven overt acts.  Based upon these allegations, the information charged defendants with conspiracy to commit murder by means of a firearm which they used to shoot and kill Jimmie Fonseca and to shoot and wound Carl Kato. (Overt Act Nos. 1 and 7.)[13]

---

[13]  The information charged defendants with conspiracy as follows:

"That on the 16th day of October, 1995, at and in the County of Sacramento, State of California, the defendants, KENNETH JEROME BOLDS, JR., MATTHEW LOREN COOK, DARRI[O]N TROY GAINS and ANTHONY SOLOMAN LOZO ... did willfully and unlawfully conspire together and with another person and persons whose identity is unknown to commit the crime of murder in violation of Section 187 of the Penal Code, a felony; that pursuant to and for the purpose of carrying out the objects and purposes of the aforesaid conspiracy, the said defendants committed the following overt act and acts at and in the

The overt acts alleged in the information gave notice that defendants were charged with conspiracy to commit murder by means of a firearm and that they shot and killed one victim and shot and wounded the other victim.

County of Sacramento.

"Overt Act No. 1: That in pursuance of said conspiracy, on the 16th day of October, 1995, defendants, MATTHEW LOREN COOK and ANTHONY SOLOMAN LOZO acquired a gun with the assistance of an acquaintance of theirs named JOSE GOMEZ.

"Overt Act No. 2: That in pursuance of said conspiracy, defendants, MATTHEW LOREN COOK and ANTHONY SOLOMAN LOZO wanted that gun in order to seek revenge against the victims . . . whom the defendants Cook and Lozo believed had robbed them and defendant DARRI[O]N TROY GAINS a few days prior to October 16, 1995.

"Overt Act No. 3: That in pursuance of said conspiracy, on the 16th day of October, 1995, defendants, MATTHEW LOREN COOK and ANTHONY SOLOMAN LOZO met defendant DARRI[O]N TROY GAINS and, along with JOSE GOMEZ, went to a clothing store located at 8th and K Streets in downtown Sacramento and bought some watch caps.

"Overt Act No. 4: That in pursuance of said conspiracy, defendants, MATTHEW LOREN COOK, DARRI[O]N TROY GAINS and ANTHONY SOLOMAN LOZO cut eyeholes in the watch caps.

"Overt Act No. 5: That in pursuance of said conspiracy, on the 16th day of October, 1995, defendants, MATTHEW LOREN COOK, DARRI[O]N TROY GAINS and ANTHONY SOLOMAN LOZO met defendant KENNETH JEROME BOLDS, JR. at the Burger King located at 7th and L Streets in downtown Sacramento and they all discussed killing JIMMIE FONSECA and CARL KATO.

"Overt Act No. 6: That in pursuance of said conspiracy, later in the evening of October 16, 1995, all of the defendants went to 2810 T Street and entered the apartment occupied by victims CARL KATO, SARAH BEASLEY and her boyfriend JIMMIE FONSECA.

"Overt Act. No. 7: That in pursuance of said conspiracy, defendant, ANTHONY SOLOMAN LOZO, shot and killed victim JIMMIE FONSECA and then shot and wounded victim CARL KATO."

29

The elements of assault with a firearm, under section 245, subdivision (a)(2) include (1) an assault, which requires the intent to commit a battery, and (2) the foreseeable consequence of which is the infliction of great bodily injury upon the subject of the assault. (*See People v. Smith* (1997) 57 Cal.App.4th 1470, 1484, 67 Cal.Rptr.2d 604.) Murder is the killing of a human being with the intent unlawfully to kill. (§§ 187, 188; *People v. Bobo* (1990) 229 Cal.App.3d 1417, 1433, 3 Cal.Rptr.2d 747.) Consequently, when murder is alleged to have been committed by means of a firearm, it cannot be so committed without also committing an assault with a firearm.

We therefore find the facts alleged in count 1 of the information, based upon Overt Acts Nos. 1 and 7, and the facts alleged in Overt Act No. 2, necessarily include and gave notice of, the elements of assault with a firearm, and the trial court properly instructed the jury in that regard.

However, relying on *Fenenbock, supra*, 46 Cal.App.4th 1688, 54 Cal.Rptr.2d 608, defendants argue that the overt acts alleged in the accusatory pleading may not be considered in determining the lesser included target offense to a charge of conspiracy to commit murder. In *Fenenbock*, three defendants were convicted of murder and conspiracy to murder. With respect to the conspiracy charge, the jury was instructed on conspiracy to commit first degree murder.

The defendants argue that the trial court erred by refusing to give instructions on conspiracy to commit offenses other than murder, such as assault, battery, or mayhem. (*Id.* at p. 1707, 54 Cal.Rptr.2d 608.) While conceding that these lesser offenses did not qualify as offenses included within the statutory definition of murder, they argue that these offenses qualified as lesser included target offenses by virtue of the facts alleged in the accusatory pleading describing the overt acts. The court in *Fenenbock* rejected this argument reasoning that,

> "[b]ecause overt acts need not be criminal offenses or even acts committed by the defendant, the description of the overt acts in the accusatory pleading does not provide notice of lesser offenses necessarily committed by the defendant. Moreover, inasmuch as overt acts may be lawful acts, the overt acts do not necessarily reveal the criminal objective of the conspiracy." (46 Cal.App.4th at p. 1709, 54 Cal.Rptr.2d 608, fn. omitted.)

We do not find this reasoning persuasive. First, an accusatory pleading does not fail to give notice merely because an overt act, or any other charged act, is not personally committed by a defendant. Defendants who do not directly commit an offense have

long been treated as principals equally liable under the law for the criminal acts committed by their accomplices *see* §§ 31-32; *People v. Beeman* (1984) 35 Cal.3d 547, 554-555, 199 Cal.Rptr. 60, 674 P.2d 1318; *People v. Jenkins* (2000) 22 Cal.4th 900, 1024, 95 Cal.Rptr.2d 377, 997 P.2d 1044), and "case law has long held due process notice satisfied as to defendants prosecuted as aiders and abettors [citation], accessories after the fact [citation], or conspirators [citation]." (*People v. Lucas* (1997) 55 Cal.App.4th 721, 737, 64 Cal.Rptr.2d 282, italics added.)  This is so because the accused receives adequate notice of the prosecution's theory from the evidence introduced at the preliminary hearing.  (*People v. Jenkins, supra*, 22 Cal.4th at p. 1024, 95 Cal.Rptr.2d 377, 997 P.2d 1044.)

In a case where a defendant is charged with murder and conspiracy to commit murder, the charge of conspiracy serves to give a defendant actual notice that he is subject to accomplice liability for the murder.  (*People v. Jenkins, supra*, 22 Cal.4th at p. 1024, 95 Cal.Rptr.2d 377, 997 P.2d 1044.)  Additionally, principles of due process require that the overt acts be pleaded with particularity in order to give defendants notice of the nature and cause of the charge so that the defendant may defend against that charge. (*Feagles v. Superior Court, supra*, 11 Cal.App.3d at pp. 739-740, 90 Cal.Rptr. 197; 4 Witkin & Epstein, *Cal.Criminal Law* (3d ed.2000) *Pretrial Proceedings*, § 187, p. 394.)  It cannot be said then that an accusatory pleading charging conspiracy, fails as a matter of law to give sufficient notice of the charged offense and any lesser included offense.

To the extent an accusatory pleading fails to allege overt acts sufficient to give notice of a lesser included offense, the trial court may not rely on the pleading as a basis to instruct on lesser included offenses not included in the allegations of that pleading. Nevertheless, the possibility that some pleadings charging conspiracy may fail to give sufficient notice of lesser included offenses is not cause to hold, as a matter of law, that no pleading charging conspiracy gives sufficient notice of lesser included offenses.

**C.**

In the case before us, the overt acts alleged in the information specified which defendants committed which overt acts, thereby giving sufficient notice to allow defendants to prepare a defense to both the charged and lesser included target offenses.

However, Lozo and Gains claim the agreement to commit a particular felony is the crucial element in a charge of conspiracy, and the overt acts do not necessarily give notice of an agreement to commit a lesser included target offense.  While this claim may be true in some cases, it is not true here.  The information provided

sufficient notice that defendants agreed to commit an offense that included the lesser included offense of assault with a firearm.  The first overt act alleged that "defendants, MATTHEW LOREN COOK and ANTHONY SOLOMAN LOZO acquired a gun . . . ." The whole thrust of the prosecution's case was that defendants agreed to go to the intended victim's residence to shoot him and defendants do not claim the preliminary hearing failed to give them notice of that fact.  Furthermore, Overt Act No. 2 alleges that "defendants, MATTHEW LOREN COOK and ANTHONY SOLOMAN LOZO wanted that gun in order to seek revenge against the victims . . . ."  While we hold in the unpublished portion of this opinion, that Overt Act No. 2 is invalid, defndants did not challenge that allegation by demurrer.  Consequently, although it does not operate as an overt act, it does give notice of the fact pleaded.

Looking to the accusatory pleading as a whole, the information gave notice that defendants were charged with conspiracy to commit murder by means of a firearm and therefore also gave notice of the lesser included offense of conspiracy to commit assault with a firearm.

Accordingly, the jury was properly instructed on the lesser included offense of conspiracy to commit assault with a firearm.

*People v. Cook*, 91 Cal.App.4th 910, 915-922 (2001).

## ii.  **Analysis**

After a review of the record as a whole, this court concludes that petitioner has failed to demonstrate the trial court's instruction on the lesser included offense of conspiracy to commit assault with a firearm violated his right to notice and due process.  For the reasons described by the California Court of Appeal, the charging document gave petitioner sufficient notice of the charge of conspiracy to commit assault with a firearm to allow him to prepare a defense to that charge.  Accordingly, the giving of a jury instruction on conspiracy to commit assault with a firearm did not render the proceedings fundamentally unfair.[14]  The decision of the state court

---

[14]  The Sixth Amendment guarantees a criminal defendant the fundamental right to be clearly informed of the nature and cause of the charges against him in order to permit adequate preparation of a defense.  *Cole v. State of Ark.*, 333 U.S. 196, 201 (1948).  *See also Strickland v. Washington*, 466 U.S. 668, 685 (1984) ("a fair trial is one in which evidence subject to adversarial testing is presented to an impartial tribunal for resolution of issues defined in

1   rejecting petitioner's claim in this regard is not contrary to or an unreasonable application of

2   federal law and is not based on an unreasonable determination of the facts in the state court

3   proceeding.  Accordingly, petitioner is not entitled to relief on this claim.

4                     c. **Jury Instruction on Withdrawal from Conspiracy**

5          In his final claim, petitioner alleges that the trial court violated his right to due process by

6   giving incomplete jury instructions on the concept of withdrawal from a conspiracy.  He argues

7   that the trial court "erred by failing to explain sua sponte that the defense need only raise a

8   reasonable doubt in order for the defense of withdrawal to relieve a defendant of responsibility

9   for any crimes that were committed following his withdrawal."  Pet. at 6b-6c.  Petitioner further

10  explains that "absent instruction to the contrary the implication to the jury would be that it was

11  petitioner's burden to prove he withdrew, rather than simply to raise a reasonable doubt as to his

12  continued involvement."  *Id.* at 6c.

13                        **I. State Court Decision**

14         The California Court of Appeal rejected these arguments, reasoning as follows:

15              Defendant Gains contends the trial court committed reversible
                error by giving incomplete instructions on the concept of
16              withdrawal from a conspiracy.  Defendant Cook joins this
                contention with further analysis, while defendant Lozo joins
17              without benefit of analysis.  The People contend this issue was
                waived or abandoned, the instruction was not supported by
18              substantial evidence, and in any event, the instructions were
                adequate as given.  We find no error.
19

20  ////

21  ////

22  ////

23  ─────────────────────

24  advance of the proceeding"); *Jackson v. Virginia*, 443 U.S. 307, 314 (1979) ("[A] conviction
    upon a charge not made . . . constitutes a denial of due process"); *Lincoln v. Sunn*, 807 F.2d 805,
    812 (9th Cir. 1987) (the Sixth Amendment guarantees a criminal defendant a fundamental right
25  "to be informed of the nature and the cause of the accusation").  The notice provision of the
    Sixth Amendment is incorporated within the Due Process Clause of the Fourteenth Amendment
26  and is applicable to the states.  *Gautt v. Lewis*, 489 F.3d 993, 1003 (9th Cir. 2007).

The court instructed the jury under CALJIC No. 6.20 on withdrawal from a conspiracy.[15]  During the course of deliberations, the jury sent a question to the court asking whether certain facts would constitute a withdrawal, and the court discussed the question with counsel.[16]  During this discussion, counsel for all three defendants indicated they did not wish further instructions beyond a rereading of the instructions that had already been given.  Nevertheless, the court felt the instruction on withdrawal was inadequate and over objection of defense counsel provided the jury with written instruction further elaborating on the substantive law of withdrawal.[17]

---

[15]   CALJIC No. 6.20 states as follows:

"A member of a conspiracy is liable for the acts and declarations of his co-conspirators until he effectively withdraws from the conspiracy or the conspiracy has terminated.

"In order to effectively withdraw from a conspiracy, there must be an affirmative and good faith rejection or repudiation of the conspiracy which must be communicated to the other conspirators of whom he has knowledge.

"If a member of a conspiracy has effectively withdrawn from the conspiracy, he is not thereafter liable for any act of the co-conspirators committed after his withdrawal – after his withdrawal from the conspiracy, but he is not relieved of responsibility for the acts of his co-conspirators committed while he was a member."

[16]   "Please explain further what would be considered as effectively withdrawing from the conspiracy?, i.e. If a member stated "I'm out of hear [sic] and ran before the crime was committed.  Does that constitute an effective withdrawal?"

[17]        "A defendant's failure to continue previously active participation in a conspiracy is not alone enough to constitute withdrawal; there must be an affirmative and good faith rejection or repudiation of the conspiracy communicated to co-conspirators.  In order to be a good faith withdrawal from a conspiracy, the withdrawal must be voluntary.

"In determining whether a withdrawal was voluntary, you should consider whether the withdrawal was motivated by a sincere change of heart or was caused by the occurrence of some unexpected intervening event of a type which would cause a participant to fear and [sic] increased risk of discovery, arrest or resistance to the commission of the crime in question.

"Since your question addressed the issue of conspiracy, I have addressed only withdrawal from a conspiracy.  There is a

Defense counsel did not request further clarification of the instructions linking the burden of proof to the issue of withdrawal, as the defense now argues on appeal is necessary.

The instruction sought by defendants on appeal is a pinpoint instruction. The trial court's duty to give pinpoint instructions arises only upon request when there is evidence supportive of the theory. (*People v. Saille* (1991) 54 Cal.3d 1103, 1119; *People v. Ervin, supra*, 22 Cal.4th at p. 90.) A pinpoint instruction is one that relates particular evidence of a defense to the prosecution's burden of proving guilty beyond a reasonable doubt. (*People v. Saille, supra*, at p. 1119; *People v. Wright* (1988) 45 Cal.3d 1126, 1138.)

The defendant's burden of persuasion on the defense of withdrawal is merely to raise a reasonable doubt of his guilt. (*See People v. Belmontes* (1988) 45 Cal.3d 744, 791.)[18] An instruction linking the burden of proof to the defense of withdrawal is therefore a pinpoint instruction which the court need only give upon request. (*People v. Saille, supra*, 54 Cal.3d at p. 1119.) Since the defense made no such request, we find the trial court had no duty to give a clarifying instruction relating the defense of withdrawal to the prosecution's burden of proof.

Opinion at 78-81.

////

---

somewhat different standard applied to the issue of withdrawal or abandonment by an aider and abettor. If you wish clarification [sic] that issue, please advise the court.

"If any of my answers have been confusing or unclear, do not hesitate to let me know and I will try to assist you further."

[18] When the defendant has the burden of raising a factual contention which, if established, would negate proof of an element of the charged offense, the defense need only raise a reasonable doubt as to the existence or nonexistence of the fact in issue. (*People v. Tewksbury* (1976) 15 Cal.3d 953, 963; Evid. Code, § 501; Pen. Code, §§ 1096, 1105.) "Under CALJIC No. 6.20 the burden is upon the defendant to go forward with evidence of his withdrawal from the conspiracy. His burden is one of production – not persuasion beyond a reasonable doubt of his non membership in the conspiracy." (*People v. Belmontes, supra*, 45 Cal.3d at p. 791.) Thus, the defense of withdrawal from a conspiracy, is a defense that negates an element of the conspiracy, namely the element of membership (see Cantoni, *Withdrawal from Conspiracy: A Constitutional Allocation of Evidentiary Burdens* (1982) 51 Fordham L. Rev. 438, 440), rather than a defense in which the accused bears the burden of persuasion. (See 1 Witkin, Cal. Evidence (4th ed. 2000) Proof and Presumptions, §§ 25-32, pp. 176-182.)

ii. **Analysis**

1

2        The state appellate court determined, in essence, that the trial court had no duty under

3   state law to give the pinpoint instruction requested by petitioner because the defense did not

4   request this instruction at trial.  That conclusion, which is based entirely on state law, may not be

5   challenged in this court.  *See Rivera v. Illinois*, ___ U.S. ___, 129 S. Ct. 1446, 1454 (2009)

6   ("[A] mere error of state law . . . is not a denial of due process") (quoting *Engle v. Isaac*, 456

7   U.S. 107, 121, n. 21 (1982) and *Estelle v. McGuire*, 502 U.S. 62, 67, 72-73 (1991)).  The

8   question before this court is whether the trial court's failure to give a pinpoint instruction

9   rendered petitioner's trial fundamentally unfair.  Where, as here, a petitioner challenges a refusal

10  or failure to give a jury instruction, the petitioner's burden is "especially heavy," because "[a]n

11  omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the

12  law." *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).  *See also Villafuerte v. Stewart*, 111 F.3d

13  616, 624 (9th Cir. 1997).

14        Petitioner has failed to meet his heavy burden with respect to this claim.  He does not

15  allege that the jury instructions actually given were incorrect or misstated the burden of proof.

16  Nor is there evidence the jury was confused about or misunderstood petitioner's burden to

17  demonstrate he withdrew from the conspiracy.  In light of this, there is no "reasonable likelihood

18  that the jury has applied the challenged instruction in a way' that violates the Constitution."

19  *Estelle*, 502 U.S. at 72 (quoting *Boyde v. California*, 494 U.S. 370, 380 (1990)).

20        Further, as noted by respondent, petitioner did not defend this case on a theory that he

21  withdrew from the conspiracy.  Rather, he argued that he was never involved with the conspiracy

22  at all.  *See* Reporter's Transcript on Appeal, at 5156, 5161; Answer at 80.  Petitioner points to no

23  evidence indicating he attempted to withdraw from the conspiracy.  Under these circumstances,

24  the trial court's failure to instruct on withdrawal from the conspiracy could not have had a

25  "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v.*

26  *Abrahamson*, 507 U.S. 619, 637 (1993).  *See also Pulido v. Chrones*, ___ F.3d ___, No. 05-

1  15916, 2010 WL 5157164, *3 (9th Cir. 2010) (applying *Brecht* harmless error test in the context

2  of a jury instruction claim).  This court also notes that it was co-defendant Bolds who ran away

3  at the scene of the crime and was acquitted of all charges by the jury.  To the extent the jury's

4  question was directed to the actions of Bolds, and not to the actions of petitioner, a pinpoint

5  instruction defining the appropriate burden of proof with regard to withdrawal from the

6  conspiracy would have had no bearing on the verdict against petitioner.  In sum, petitioner has

7  failed to demonstrate a due process violation resulting from the trial court's failure to give a

8  pinpoint instruction explaining the burden of proof with respect to withdrawal from a conspiracy.

9  **IV.  Conclusion**

10          Accordingly, for all of the foregoing reasons, IT IS HEREBY RECOMMENDED that

11  petitioner's application for a writ of habeas corpus be denied.

12          These findings and recommendations are submitted to the United States District Judge

13  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one

14  days after being served with these findings and recommendations, any party may file written

15  objections with the court and serve a copy on all parties.  Such a document should be captioned

16  "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections

17  within the specified time may waive the right to appeal the District Court's order.  *Turner v.*

18  *Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).  In

19  his objections petitioner may address whether a certificate of appealability should issue in the

20  event he files an appeal of the judgment in this case.  *See* Rule 11, Federal Rules Governing

21  Section 2254 Cases (the district court must issue or deny a certificate of appealability when it

22  enters a final order adverse to the applicant).

23  DATED:  April 18, 2011.

24

25                          EDMUND F. BRENNAN
                            UNITED STATES MAGISTRATE JUDGE

26